*Romechia Simms v. Maryland Dept. of Health, et al.*, No. 1898, September Term, 2017.
Opinion by Wright, Alexander.


**CONDITIONAL RELEASE – HOSPITAL WARRANT – DANGEROUSNESS –
DUE PROCESS**


The legal standard for circuit court issuing a hospital warrant pursuant to Md. Code
(2001, 2008 Repl. Vol.) of the Criminal Procedure Article ("CP") § 3-121(c), is whether
probable cause exists to believe that an individual violated a term of an Order of
Conditional Release.  A finding of dangerousness occurs before the Administrative Law
Judge, and a finding of dangerousness is not required for the issuance of a hospital
warrant.  The circuit court did not err in its judgment.

Circuit Court for Howard County
Case No. 13-C-17-112909

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1898

September Term, 2017
_____

ROMECHIA SIMMS

v.

MARYLAND DEPARTMENT
OF HEALTH, ET AL.
_____

Wright,
Nazarian,
Wilner, Alan M.
 (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Wright, J.
_____

Filed:  February 27, 2019

## BACKGROUND

In February 2016 in the Circuit Court for Charles County, Romechia Simms, appellant, was found not criminally responsible ("NCR") for the death of her three-year-old son. She was conditionally released from commitment to the Maryland Department of Health ("the Department"), appellees, subject to conditions. Alleging that Ms. Simms violated her Order of Conditional Release, the State petitioned the circuit court to issue a hospital warrant pursuant to Md. Code (2001, 2008 Repl. Vol.), § 3-121(c) of the Criminal Procedure Article ("CP"). The circuit court granted the relief requested and issued a hospital warrant directing that Simms be transported to the hospital for an administrative review hearing.

In September 2017, an Administrative Law Judge ("ALJ") recommended that Ms. Simms be released from confinement subject to several conditions, including a voluntary stay at the Clifton T. Perkins Hospital Center ("Perkins Hospital") until she could be placed at an appropriate residential treatment center. In October 2017, the circuit court accepted the ALJ's recommendations.

Before being conditionally released, Ms. Simms filed a Petition for Writ of Habeas Corpus with the Circuit Court for Howard County, the county where the hospital was located, alleging that she was being unconstitutionally confined. The circuit court found that Ms. Simms was not entitled to relief because the hospital warrant issued by the

Circuit Court for Charles County was lawful. Ms. Simms timely appealed and presents the following questions for our review, which we have expanded for ease of discussion:[1]

> 1. Is this appeal permitted by law?
>
> 2. Is this appeal moot?
>
> 3. Whether a finding of dangerousness must be made to support a circuit court's finding that a hospital warrant should be issued for a person on conditional release, and whether a lack of such a finding be violative of due process?

As to the first question presented, we answer in the affirmative, and answer the second third questions in the negative. As to the third question, Ms. Simms makes two arguments but they are really two faces of the same coin. Her first argument is that dangerousness must be established anew during the hospital warrant phase, and second that it is a failure of due process not to do so. We must necessarily address the first argument before we address the second, as the negative answer to the first, necessarily requires an answer of no merit to the second.

## FACTUAL AND PROCEDURAL BACKGROUND

Ms. Simms has battled serious mental health issues since late 2014, when she first began experiencing visions and beliefs that people were knocking on her door with guns. In February 2015, her symptoms worsened, and she began to believe that people were

---

[1] Ms. Simms' original question on appeal was:

> 1. Did the Circuit Court for Howard County err in denying the petition for writ of habeas corpus?

2

trying to kill her. Around this time, Ms. Simms was evaluated at Southern Maryland Hospital Center ("SMHC"), where she would later be readmitted.

At SMHC, Ms. Simms espoused beliefs that she and her family members had been raped under hypnosis, and that both she and her son had been shot. Around that same time, she jumped out of a moving taxi with her son and threatened the taxi driver. She was diagnosed with a psychotic disorder and was discharged in March 2015.

In April 2015, Ms. Simms participated in an intake assessment at Regenerations Counseling Services where she complained of "stress" but was unable to identify the cause behind her stress. She was described as "guarded, paranoid, depressed, and irritable." Later that month, Ms. Simms met with a psychiatrist and stated a belief that people, including her boyfriend, were trying to kill her.

Ms. Simms' degrading mental health condition ended in tragedy. In May 2015, police found Ms. Simms pushing a swing holding the body of her deceased three-year-old son. Ms. Simms had reportedly pushed the child on the swing for forty straight hours. She was charged with Child Abuse Resulting in Death, Involuntary Manslaughter and Child Neglect on September 11, 2015.

In December 2015, Ms. Simms participated in a pretrial evaluation where she was considered competent to stand trial. Ultimately, she was found NCR based on evidence of experiencing auditory hallucinations, visual hallucinations, and paranoid delusions that made her feel unsafe. She also claimed that her sleep was impaired and voices told her to take her son to the park. Once there, the voices told her that there was a battle in the park between heaven and hell, and that her son would remain safe in the swing.

3

Ms. Simms was readmitted at SMHC after her son's death. The reason for admission was listed as "psychosis." Ms. Simms was described as tearful and confused. She was diagnosed with schizophrenia, prescribed Haloperidol, Benztropine, and Mirtazapine, and was discharged at the end of the month. In August 2015, Ms. Simms met with a psychiatrist and endorsed "passive death wishes, stating, 'Sometimes I wish I was dead.'"

In February 2016, Ms. Simms entered an *Alford* plea[2] to the charge of involuntary manslaughter. After reviewing reports from experts for both the State and the defense, the Circuit Court for Charles County found that, at the time of the criminal act, Ms. Simms had a mental disorder that caused her to lack the capacity to appreciate the criminality of her act and to conform her actions in accordance with the law. Subsequently, the circuit court found Ms. Simms NCR for the involuntary manslaughter of her son and determined that she would not be a danger to herself or the person or property of others, if released with conditions.

In March 2016, the circuit court issued an Order of Conditional Release for Ms. Simms, pursuant to CP §§ 3-111 and CP 3-112. Ms. Simms was conditionally released from commitment to the Department subject to the following conditions:

> 1.     The Community Forensic Aftercare Program ("CFAP") of the [Department] shall be responsible for coordinating and monitoring the conditions of the defendant's release, including notification to all of the

---

[2] *See North Carolina v. Alford*, 400 U.S. 25 (1970). An *Alford* plea is a "specialized type of guilty plea where the defendant, although pleading guilty, continues to deny his or her guilt, but enters the plea to avoid the threat of greater punishment." *Ward v. State*, 83 Md. App. 474, 478 (1990). In *Ward*, this Court held that an *Alford* plea was the functional equivalent of a guilty plea. *Id*. at 480.

necessary parties that will be expected to provide services to [Ms. Simms]. [Ms. Simms] shall comply with all lawful instructions, directions and recommendations given to her by CFAP.

2.      [Ms. Simms] shall reside at [her address].  Any change in residence must be reported by [Ms. Simms] to and approved by CFAP prior to relocation.

3.      [Ms. Simms] shall be seen for psychiatric follow-up with QCI Behavioral Health . . . .  She will participate in individual therapy twice per week with a therapist identified by the agency.  The patient will initially be seen monthly by the psychiatrist and twice per week by a therapist. Thereafter, any change in therapist, psychiatrist, clinic or frequency of appointments must be approved in writing by CFAP prior to any changes going into effect.

4.      [Ms. Simms] shall attend and participate in any other program or activity as recommended and arranged by the therapist, psychiatrist or [the Department].  Ms. Simms shall follow all of their rules and requirements. This may include a day treatment or partial hospitalization program.

5.      [Ms.] Simms will take medication as prescribed, and shall submit to periodic blood tests to confirm the presence or levels of medication if requested.  Ms. Simms shall pay for said tests.

6.      [Ms.] Simms shall not take illicit drugs including marijuana, or use alcohol. She will also not take the substance commonly referred to as "K2" or "Synthetic Marijuana."  She shall submit to toxicology testing, urine, blood and breathalyzer testing upon request of her treatment team or CFAP monitor.  She shall participate and complete an outpatient substance abuse program and provide documentation of completion of the program.  In addition, Ms. Simms may be required to attend NA/AA if requested by her treatment team or CFAP monitor.

7.      [Ms.] Simms shall not own, possess or use, or attempt to own, possess or use a firearm or weapon.

8.      [Ms.] Simms shall not be in the company of any minor unless there is another adult present.  [Ms.] Simms will not undertake to be the care giver of any minor.

9. [Ms.] Simms shall immediately discuss with her therapist or case manager and abide by any resulting reasonable recommendations made regarding the following:
a. Change in residence, employment, or activities
b. Change in marital status or family composition
c. Change in physical or mental health
d. Legal involvements
e. Trips outside the state of Maryland
f. Failure to meet clinic or program requirements.

10. [Ms.] Simms shall obey all laws and in the event she is charged, arrested or convicted of any crime she will notify the CFAP immediately.

11. [Ms.] Simms will appear in Court when instructed to do so. For the first year of [Ms.] Simms' Conditional Release, the Court will hold a hearing every 90 days to determine the Defendant's progress and compliance with her treatment and release. The Defendant will appear at each hearing. After the first year of Conditional Release, the Court shall have the discretion to hold a hearing at any time to determine the Defendant's progress and compliance with her treatment and release. Additionally, the State and/or Defendant may request a hearing at any time to determine the Defendant's progress and compliance with her treatment and release.

12. [Ms.] Simms agrees that [the Department] will have the right to order an independent psychiatric evaluation at any time, and she further agrees she will participate in and fully cooperate with such an evaluation.

13. If [Ms.] Simms' mental illness becomes active, she may seek voluntary admission to a mental hospital for the purpose of treatment. Any such hospitalization shall not be construed to be a violation of conditional release.

14. If [Ms.] Simms' mental illness becomes active such that her treating mental health personnel recommend inpatient treatment and she is unwilling to be voluntarily admitted to a mental hospital, this shall be deemed a violation of conditional release.

15. The CFAP shall be permitted to frequently communicate with any person, including the therapist, having knowledge of [Ms.] Simms' clinical condition, and shall be furnished with all documentation concerning her status that may be necessary to monitor her ongoing clinical condition.

6

16.     During the period of conditional release, [Ms.] Simms shall remain subject to the jurisdiction of this court, to the general supervision of [the Department], and to the reasonable requirements of [the Department] pertaining to her conditions of the release.

17.     If at any time within the five years of this Conditional Release Order, [Ms.] Simms does not comply with the conditions of her release, the CFAP shall immediately notify the Court and the State's Attorney. Pursuant to [CP § 3-121], a hospital warrant may be issued and [Ms.] Simms may be committed to a facility designated by [the Department] pending a revocation hearing.  If, after a revocation hearing, Ms. Simms is found to have violated any condition of her release, the Court may revoke her Conditional Release and she could be committed to [the Department] for placement in an inpatient facility designated by [the Department].

The circuit court further ordered that CFAP would promptly notify the State's

Attorney for Charles County and the court if Ms. Simms failed to comply with the

conditions.

In March 2017, the circuit court issued an Amended Order of Conditional Release.

The amended order stated that the Department recommended that Ms. Simms be

discharged from the Assertive Community Treatment Team to regular outpatient clinical

services with QCI Behavioral Health.  This modified condition #4.

On September 12, 2017, Kierrah Flipping, Ms. Simms' therapist and the clinical

director of QCI Behavioral Health, wrote to Lori Mannino, LCSW-C, expressing

concerns about Ms. Simms because she was exhibiting a "decrease in psychological

functioning."  She noted that Ms. Simms missed appointments on August 7, August 21,

September 7, and September 11, 2017.  Ms. Flipping observed that Ms. Simms had

shown symptoms of "depression, anxiety, irritable mood, easily distracted, unable to

concentrate/focus, short term memory loss, and grieving the death of her son," which she

7

believed might have been attributable to the anniversary of Ms. Simms' son's death. Ms. Flipping recommended that Ms. Simms "obtain a psychological evaluation and be reconsidered for a higher level of treatment than what is currently being given."

A Conditional Release Reporting Form dated September 12, 2017, noted that for the reporting period of August 2017, Ms. Simms had five appointments scheduled and had missed two of them because she forgot the appointments, although her treatment team had put several interventions in place, including telephone reminders. An Emergency Reporting Form also indicated that Ms. Flipping believed that Ms. Simms' mental status was in decline.

Ms. Simms' 90-day status hearing was held on September 13, 2017, and the State's Attorney filed a Petition for Revocation of Conditional Release with the circuit court alleging that Ms. Simms violated condition #4 of her Conditional Release Order.

According to the State, a therapist at QCI Behavioral Health informed the State that Ms. Simms was not complying with all of her clinical appointments, and that she missed appointments on June 20, August 7, August 21, September 7, and September 11, 2017. Thus, the State petitioned the circuit court to (1) issue a hospital warrant for Ms. Simms, (2) direct that upon execution of the warrant Ms. Simms be transferred to Perkins Hospital for examination and evaluation, (3) set an administrative hearing within ten days after the attachment of Ms. Simms, and (4) revoke Ms. Simms' conditional release. On September 13, 2017, the circuit court heard the State's Petition for Revocation of Conditional Release. Counsel for Ms. Simms argued that Ms. Simms had attended some of her therapy appointments. The State informed the court that it had "added the

8

condition of [Ms. Simms] not appearing [for this court date], to the violations of conditional release," which it later waived.[3] The court recessed to give Ms. Simms time to arrive.

The circuit court reconvened from its recess and heard testimony from Lori Mannino, Ms. Simms' monitor. Ms. Mannino testified that she had reached out to Ms. Simms' mental health providers on September 8, 2017, to inform them that a court date was scheduled for September 13, 2017, and that she had not received documentation from them. Ms. Flipping notified Ms. Mannino of concerns she had regarding Ms. Simms' behavior. Ms. Mannino reviewed the appointment log and learned that, excluding some missed appointments that were excused by the court, Ms. Simms was a no-call and no-show on August 7, August 21, September 7, and September 11, just two days before her September 13, 2017 status hearing.[4] Ms. Mannino testified that Ms. Simms was given appointment cards and reminders by phone.

Ms. Mannino inquired with the therapist about Ms. Simms' mental health status. She testified that the documentation indicated that Ms. Simms needed a higher level of

---

[3] Both parties submitted that Ms. Simms received notice of the September 13, 2017 date on June 26, 2017, well before the hearing date but prior to some of her missed appointments.

[4] Ms. Simms attended appointments on August 14 and August 28, 2017.

care.[5] Ms. Mannino further testified that Ms. Simms would need to be evaluated to determine whether she needed a higher level of care.

The circuit court resumed hearings on September 14, 2017. Ms. Simms' counsel argued that there was no probable cause of Ms. Simms' dangerousness because Ms. Simms had gone to the hospital that morning and was deemed "not appropriate for hospitalization." Therefore, Ms. Simms' counsel argued that the State's position raised due process concerns.[6] Further, Ms. Simms' counsel argued that the court only had a "recommendation for more intensive care," which was not enough under the probable cause standard.

The State argued that Ms. Simms needed appropriate mental care, which was bolstered by her inconsistent attendance at therapy appointments. The State noted that it did not seek a Revocation of Conditional Release when Ms. Simms missed appointments due to her car accident. Of note, the State said:

> [W]hen there is a pattern of missing appointments, no call, no show, no explanation for it, and there is in combination with that concern about some observations they're making of her mental health, absolutely I think that it's [the State's] job to bring that then to the Court's attention. That's probable cause right there.

The circuit court noted that it was just looking at whether there was "probable cause that a conditional release has been violated," and that an ALJ would determine

---

[5] Ms. Simms was originally in Mobile Treatment, but was doing so well that the Department modified the Conditional Release Order. However, as of the September 13, 2017 status hearing, Mobile Treatment was not accessible until the beginning of October.

[6] Ms. Simms told the circuit court that she was at the hospital "for [her] migraines" the day before, and then for an evaluation the morning of September 14, 2017.

10

dangerousness. Ms. Simms informed the court that she did not believe "the missed appointments [are] valid based on the flow of things at QCI at the time." The court granted the State's request and issued a hospital warrant, pursuant to CP § 3-121, on September 14, 2017, noting that "probable cause exists that [Ms. Simms] violated a conditional release[,] and ordering that Ms. Simms be transferred to the [Perkins Hospital] for evaluation and examination." The order set the matter for an administrative hearing at Perkins Hospital within ten days after the execution of the warrant.

Upon admission at Perkins Hospital, Ms. Simms was evaluated by Dr. Monica Chawla who reported that Ms. Simms was "guarded, minimized the significance of her symptoms, and lacked insight into her mental illness." However, Dr. Chawla determined that Ms. Simms would not pose a danger to self or others if she was discharged with modifications to the conditions of her release.

**ALJ Hearing and Recommendations**

Seven days later, on September 21, 2017, an ALJ held a hearing, pursuant to CP § 3-121(f), to determine (1) whether Ms. Simms had violated a condition of her release, and (2) whether she was eligible for release with conditions.

Regarding Ms. Simms' eligibility for conditional release, Ms. Simms and the Department agreed to modified conditions allowing her to reside at a residential treatment center upon release from Perkins Hospital. On September 28, 2017, the ALJ recommended that the circuit court adopt the modified release conditions.

**Circuit Court Ruling**

11

On October 20, 2017, the Circuit Court for Charles County adopted the findings and recommendations of the ALJ and ordered Ms. Simms' conditional release.

**The Writ of Habeas Corpus Petition, Hearing, and Ruling**

Before the Circuit Court for Charles County conditionally released Ms. Simms, she petitioned the Circuit Court for Howard County for a Writ of *Habeas Corpus*. She alleged that she was not presently a danger to herself or anyone else, and that many mental health professionals concluded that she did not meet the clinical criteria for hospitalization. She also alleged that she was being "illegally detained in a maximum security mental health hospital," and she therefore challenged her confinement. Ms. Simms requested that the Circuit Court for Howard County produce her for an immediate hearing to "inquire into the legality and propriety of her confinement." Therefore, she asked the court to immediately act upon her petition pursuant to Md. Rule 15-303(c).[7]

In an affidavit, Ms. Simms stated that she missed her appointments in the Spring of 2017 due to an automobile accident and claimed that the Department and Circuit Court

---

[7] Md. Rule 15-303(c) states in pertinent part:

> **(c) Referral.** If the petition is made by or on behalf of an individual confined or restrained as the result of a prior judicial proceeding, a judge to whom the petition has been made may refer the petition, without taking other action, to the administrative judge of the court in which the prior proceeding was held. In exercising the discretion to refer the petition, the judge to whom the petition has been directed shall consider the interests and convenience of the parties and the State. Upon receiving the referral, the administrative judge shall assign the petition to a judge in accordance with the assignment procedures of that court, except that, without the written consent of the individual confined or restrained, the petition shall not be assigned to any judge who sat at the proceeding as a result of which the individual was confined or restrained. The judge to whom the petition has been assigned may not further refer the petition and shall act on it immediately pursuant to section (d) or (e) of this Rule.

12

for Charles County excused those missed appointments. Ms. Simms also claimed that she had a change in her treating therapist and that since her accident, she had attended nine therapy appointments and missed only five. Her treatment provider expressed concern that Ms. Simms was exhibiting a "decrease in psychological functioning," but determined that she remained medication compliant. QCI's "Progress Note" in August 2017, noted that Ms. Simms' affect was appropriate, her thought process was organized, and that she had no thoughts of harm to herself or others. She alleged that after QCI's concerns were forwarded to the Department, the Department wrote the State alleging a violation of condition #4 of the Conditional Release Order, citing to the original condition, rather than the amended condition.

Ms. Simms also claimed that during the September 13, 2017 hearing, her counsel argued that due process required that Ms. Simms could not be hospitalized absent probable cause to suggest she was a danger to herself or others, and that no such evidence of dangerousness was presented to the court. In her affidavit, Ms. Simms also argued that she had a right to a preliminary hearing before being "confined against her will." Ms. Simms pointed to a letter written by Lisa Chernoff, LCPC, dated September 14, 2017, noting that when Ms. Simms came to the emergency room at the University of Maryland Charles Regional Medical Center "she [did] not meet criteria for an inpatient psychiatric admission."

The Department filed its motion to dismiss Ms. Simms' Petition for Writ of *Habeas Corpus* on October 16, 2017. The Department argued that Ms. Simms agreed to remain at Perkins Hospital as a voluntary patient and was not denied due process. The

13

Department further argued that *habeas* relief was not an appropriate remedy for Ms. Simms because it is not "a substitute for an appeal."

The Circuit Court for Howard County heard argument on the Petition for Writ of *Habeas Corpus* on October 23, 2017. Counsel for Ms. Simms argued that she was found not dangerous during the ALJ hearing and was found to be eligible for conditional release. Counsel for Ms. Simms also argued that the circuit court should release her from voluntary admission at Perkins Hospital until the Department could plan for her to be placed at a suitable residential program.

The next issue Ms. Simms' counsel addressed was "what due process is due under the due process clause before someone can be taken in on a hospital warrant[?]" Counsel for Ms. Simms argued that the appropriate legal standard for issuing a hospital warrant was probable cause that (1) Ms. Simms violated her conditional release and (2) was no longer eligible for conditional release due to a preliminary finding of dangerousness.

The State responded that it is the role of the court, not Ms. Simms' treatment team, to make a finding of dangerousness. The State noted that the evidence that Ms. Simms violated her conditional release was attached to the original petition and included the Modified Conditional Release Order. The State differentiated a civil commitment, which takes into account acute and imminent dangerousness, from a finding of dangerousness that Ms. Simms sought. The State noted that although QCI recommended a higher level of care, the appropriate level of care in the community at the time was unavailable, so the next highest level of care available was in-patient hospitalization.

14

On October 31, 2017, the Circuit Court for Howard County found that Ms. Simms' petition for Writ of *Habeas Corpus* was proper, but that its review of her confinement was limited to the September 14, 2017 hospital warrant, and the September 14, 2017 hospital warrant was supported by probable cause. The court also determined that the State made the necessary allegations as required by CP § 3-121(c) and that the Circuit Court for Charles County properly considered the State's petition. Turning to whether the hospital warrant was supported by probable cause, the court ruled that it was, and that Ms. Simms' confinement did not violate her due process rights.

## STANDARD OF REVIEW

We explained the applicable standard of appellate review that we apply to a circuit court's denial of a petition for *habeas corpus* relief in *Wilson v. Simms*, 157 Md. App. 82, 91 (2004):

> We review the denial of an application for *habeas corpus* relief under the standard set forth in [Md.] Rule 8-131(c). We will review the case on both the law and the evidence, and we will not set aside the judgment on the evidence unless clearly erroneous. Additionally, we note that [Md.] Rule 15-303(e)(3)(A) provides that the court shall grant the writ unless "the judge finds from the petition, any response, reply, document filed with the petition or with a response or reply, or public record that the individual confined or restrained is not entitled to any relief."

(Quotations and citations omitted).

"Under the clearly erroneous standard, [we do] not sit as a second trial court, reviewing all the facts to determine whether an appellant has adequately proven his [or her] case." *Liberty Mutual Ins. Co. v. Maryland Auto Ins. Fund*, 154 Md. App. 604, 609 (2004) (citation and quotations omitted). Our review is limited to deciding whether the

15

circuit court's factual findings were supported by "substantial evidence" in the record. *GMC v. Schmitz*, 362 Md. 229, 234 (2001) (quoting *Ryan v. Thurston*, 276 Md. 390, 392 (1975)). In so doing, we view all the evidence "in a light most favorable to the prevailing party." *Id.*

## DISCUSSION

## I. Appealability

The State included, in its brief, a motion to dismiss, contending that this appeal is not permitted by law because it does not fall within the recognized statutory bases for appealing a writ of *habeas corpus*.

In *Simms v. Shearin*, 221 Md. App. 460, 468 (2015), this Court explained that :

> [a] writ of *habeas corpus* . . . is "a writ employed to bring a person before a court, most frequently to ensure that the person's imprisonment or detention is not illegal." BLACK'S LAW DICTIONARY (10th ed. 2014). This common law writ was codified in 1809 and was later enveloped by the protections of the Maryland Constitution in 1867. *Olewiler v. Brady*, 185 Md. 341, 345-46 (1945) (citations omitted).

In *Simms*, 221 Md. App. at 468, we addressed the statutory provisions that apply to appeals taken from final orders in *habeas corpus* cases. We observed that "the Court of Appeals has 'consistently held that statutory provisions like [Md. Code, (1973, 2013 Repl. Vol.), Courts & Judicial Proceedings Article ("CJP"), § 12-301], generally authorizing an 'appeal from a final judgment entered in a civil or criminal case,' do not apply to *habeas corpus* cases.'" *Id.* at 469 (quoting *Gluckstern v. Sutton*, 319 Md. 634, 652, *cert. denied sub nom. Henneberry v. Sutton*, 498 U.S. 950 (1990)). Rather, an

16

"appeal may be taken from a final order in a *habeas corpus* case only where specifically authorized by statute." *Id.* (citations omitted).

We further noted that the Court of Appeals has identified four statutes authorizing appeals from final orders in *habeas corpus* cases: CP § 9-110, "which authorizes appeals in extradition cases;" CJP § 3-706, "which provides for an appeal if a court issued a writ of *habeas corpus* based on the unconstitutionality of the law under which the petitioner was convicted;" CJP § 3-707, "which authorizes an application for leave to appeal in cases involving right to bail or allegedly excessive bail;" and CP § 7-107, part of the Maryland Uniform Postconviction Procedure Act, "which permits an appeal if the writ was sought under CP § 9-110 or for a purpose other than to challenge the legality of a conviction or sentence." *Simms*, 221 Md. App. at 469-70.

The only statute under which we could entertain this appeal is CP § 7-107. That statute provides, in pertinent part,

> (b)(1) In a case in which a person challenges the validity of confinement under a sentence of imprisonment by seeking the writ of *habeas corpus* or the writ of *coram nobis* or by invoking a common law or statutory remedy other than this title, a person may not appeal to the Court of Appeals or the Court of Special Appeals.
>
> (2) This subtitle does not bar an appeal to the Court of Special Appeals:
> (i) in a *habeas corpus* proceeding begun under § 9-110 of this article; or
>
> (ii) in any other proceeding in which a writ of *habeas corpus* is sought for a purpose other than to challenge the legality of a conviction of a crime or sentence of imprisonment for the conviction of the crime, including confinement as a result of a proceeding under Title 4 of the Correctional Services Article.

CP § 7-107(b).

17

In *Gluckstern*, the Court of Appeals interpreted a provision similar to CP § 7-107[8] as barring the right of appeal in *habeas corpus* cases where the prisoner was challenging the original criminal proceeding, which had led to the incarceration, but permitting appeals "[i]n situations where the Postconviction Procedure Act did not provide a remedy, and thus was not a substitute for *habeas corpus*[.]" *Gluckstern*, 319 Md. at 662. Thus, we must assess whether Ms. Simms' claim could have been brought in a postconviction proceeding, because if it could have been, this appeal is barred.

Ms. Simms argues, and we agree, that her appeal is permitted under the rationale in *Gluckstern*. Her appeal challenges a ruling collateral to her involuntary manslaughter conviction and her placement on conditional release – namely, the issue of a hospital warrant to bring her to Perkins Hospital. *See Gluckstern*, 319 Md. at 657-63 (explaining that the habeas appeal was permitted under Art. 27 § 645A(e) because it was a collateral

---

[8] The statute at issue in *Gluckstern*, [Md.] Code (1957, 1987 Repl. Vol., 1989 Cum. Supp.), Art. 27, 645A(e), is the antecedent of the current provision in the Postconviction Procedure Act but is not substantively different. It provided:

> No appeals to the Court of Appeals or the Court of Special Appeals in *habeas corpus* or *coram nobis* cases, or from other common-law or statutory remedies which have heretofore been available for challenging the validity of incarceration under sentence of death or imprisonment shall be permitted or entertained, except appeals in such cases pending in the Court of Appeals on June 1, 1958, shall be processed in due course. Provided, however, that nothing in this subtitle shall operate to bar an appeal to the Court of Special Appeals (1) in a *habeas corpus* proceeding instituted under § 2-210 of Article 41 of this Code or (2) in any other proceeding in which a writ of *habeas corpus* is sought for any purpose other than to challenge the legality of a conviction of a crime or sentence of death or imprisonment therefor, including confinement as a result of a proceeding under Article 31B of this Code.

18

challenge to the criminal judgment at issue.); *Cf. Simms*, 221 Md. App. at 474-79 (The

*habeas* petition directly challenged the validity of the underlying convictions by arguing

that key DNA evidence had been destroyed and because it argued that key DNA evidence

had been destroyed and because CP § 8-201 already provided for post-conviction review

of DNA evidence.)

## II. Mootness

The Department, in its brief and motion to dismiss, argues that this matter is moot

because Ms. Simms is not now confined. The Department contends that Ms. Simms'

appeal no longer presents an existing controversy and there is no effective remedy this

Court can grant.

A case is deemed moot when "there is no longer an existing controversy between

the parties, so that there is no longer any effective remedy which the court can

provide." *Powell v. Maryland Dep't of Health*, 455 Md. 520, 539 (2017) (quoting *Mercy

Hosp., Inc. v. Jackson*, 306 Md. 556, 561 (1986)). Courts generally do not address moot

controversies. *State v. Dixon*, 230 Md. App. 273, 277 (2016).

There are two exceptions to the mootness doctrine, which we outlined in a recent

opinion, *State v. Crawford*, 239 Md. App. 84, 113 (2018):

> [T]here are exceptions to the mootness doctrine. First, this Court may
> address the merits of a moot case if the controversy is "'capable of
> repetition but evading review.'" This exception applies when (1) the
> challenged action was too short in its duration to be fully litigated prior to
> its cessation or expiration; and (2) there was a reasonable expectation that
> the same complaining party would be subjected to the same action again.

19

Second, courts may review an otherwise moot controversy if the issue is of public importance and affects an identifiable group for whom the complaining party is an appropriate surrogate.

As the Court of Appeals has explained: [I]f a matter's recurrence will involve a relationship between government and its citizens, or a duty of government, and upon any recurrence, the same difficulty which prevented the appeal at hand from being heard in time is likely again to prevent a decision, then [the] Court may find justification for deciding the issues raised by a question which has become moot, particularly if all these factors concur with sufficient weight.

The first exception to the mootness rule applies, and the legal standard governing the issuance of a hospital warrant is "capable of repetition" yet evades review. Ms. Simms continues to be subject to the order of conditional release until it expires on March 14, 2021. If in the future Ms. Simms is charged with violating her conditional release, the State may again seek a hospital warrant. In addition, as to the second exception, this matter is of public importance as it involves the relationship between the government and citizens subject to conditional release from commitment to the Department, and there is no question that Ms. Simms is an appropriate surrogate. Therefore, this case is appropriate for appellate review.

### III. Dangerousness

Ms. Simms presents an issue of first impression to this Court: whether a finding of dangerousness must be made to support a circuit court's finding that a hospital warrant should be issued for a person on conditional release. She avers that the Circuit Court for Charles County applied the incorrect legal standard when considering the State's request for a hospital warrant and erred in issuing the hospital warrant. She contends that the circuit court should have made two separate findings before issuing a hospital warrant:

20

(1) that there was probable cause to believe that she violated the terms of her conditional release, and (2) that there was probable cause that she was no longer eligible for conditional release because she posed a danger to herself, others or property. She went on to assert that under CP § 3-121 and constitutional principles of due process attendant to that statute, a hospital warrant may be issued only if probable cause exists as to both considerations.

Ms. Simms argues that the Supreme Court has long held that "[t]here can be no doubt that involuntary commitment to a mental hospital, like involuntary confinement of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law." *O'Connor v. Donaldson*, 422 U.S. 563, 580 (1975); *Addington v. Texas*, 441 U.S. 418, 425 (1979) ("This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."). Procedural due process, the form of due process at issue here, "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976); *see also Addington*, 441 U.S. at 425 ("[T]he function of legal process is to minimize the risk of erroneous decisions.") Moreover, as the Court of Appeals recently underscored, "[t]he constitutional guarantee of procedural due process also requires that a defendant have the opportunity to confront and contest adverse evidence and the opportunity to have the court consider" mitigating evidence. *State v. Brookman*, 460 Md. 291, 322 (2018). Ms.

21

Simms contends that by issuing a hospital warrant without considering the question of dangerousness, the circuit court deprived Ms. Simms of <u>all</u> due process owed to her.

Ms. Simms contends that relevant to the due process argument is the Supreme Court's repeated reaffirmation that a finding of dangerousness must underpin a decision to commit someone involuntarily. *See Foucha v. Louisiana*, 504 U.S. 71, 77 (1992) (holding that as a matter of due process, an individual acquitted by reason of insanity "may be held as long as he is both mentally ill and dangerous, but no longer"); *Jones v. United States*, 463 U.S. 354, 368 (1983) ("The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous."). Therefore, Ms. Simms avers that due process requires that for someone facing hospitalization, there must be a determination that the individual poses a *bona fide* danger to self, others, or property.

Ms. Simms concedes that the circuit court was authorized to conditionally release her after she entered an *Alford* plea to one count of involuntary manslaughter and was determined to be NCR at the time of the offense. Ms. Simms contends, however, that in order to comply with due process, the circuit court could issue a hospital warrant only if it determined that there was probable cause to believe (1) that she violated a term of the conditional release order, and (2) that she was no longer eligible for conditional release because she was a danger. She avers that her interpretation of CP § 3-121(e) would dovetail with the express language in CP § 3-121(c)(1), which states that a petition requesting revocation must contain "a statement that the committed person has violated a term of the conditional release and that there is therefore reason to believe that the committed person no longer meets the criteria for eligibility of conditional release[.]"

22

Ms. Simms argues that by considering only whether she violated a term of her release, the circuit court did not meaningfully consider what might be in the best interest of Ms. Simms' mental health and did not meaningfully consider mitigating evidence presented by counsel. Therefore, she maintains that the issuance of the hospital warrant was not pursuant to the applicable statute and violated due process.

The State responds that the Circuit Court for Howard County correctly denied Ms. Simms' *habeas* petition because she was lawfully confined at Perkins Hospital for the ten-day period, the hospital warrant was supported by probable cause, and she was provided with due process of law.

### IV. Analysis

Conditional release is "part of a continuing course of treatment." *Bergstein v. State*, 322 Md. 506, 516 (1991). Ms. Simms was conditionally released pursuant to CP § 3-114, which provides:

> (c) A committed person is eligible for conditional release from commitment only if that person would not be a danger, as a result of mental disorder or mental retardation, to self or to the person or property of others if released from confinement with conditions imposed by the court.

Ms. Simms was conditionally released because it was determined that she would not pose a danger if she followed the terms of her conditional release. *Bergstein*, 322 Md. at 519. ("Inherent in [the commission of an illegal act] is the indicia of continuing dangerousness."). When an individual violates a term of their conditional release, the State may petition the circuit court for a hospital warrant pursuant to CP § 3-121(c), which provides that a hospital warrant must contain:

23

(1) a statement that the committed person has violated a term of a conditional release and that there is therefore reason to believe that the committed person no longer meets the criteria for eligibility for conditional release;

(2) a statement of the conditions violated;

(3) the factual basis for the statements in items (1) and (2) of this subsection;

(4) the most recent evaluation report on the committed person; and

(5) the designation by the Health Department of the facility to receive the returned committed person.

If a petition for revocation of conditional release has been filed, CP § 3-121(e) governs the proceedings and states:

(e) *Determination of probable cause.* – If the court's review of the petition determines that there is probable cause to believe that the committed person has violated a conditional release, the court promptly shall:

(1) issue a hospital warrant for the committed person and direct that on execution the committed person shall be transported to the facility designated by the Health Department; and

(2) send a copy of the hospital warrant and the petition to:

(i) the State's Attorney;
(ii) the Public Defender;
(iii) the counsel of record for the committed person;
(iv) the person who reported the violation;
(v) the Office; and
(vi) the Health Department.

After an individual has been brought to a hospital, pursuant to a hospital warrant, CP § 3-121(f) addresses the procedures that occur before an ALJ:

(f) *Revocation hearing required.* – Within 10 days after the committed person is returned to the Health Department in accordance with the hospital warrant, the Office shall hold a hearing unless:

24

(1) the hearing is postponed or waived by agreement of the parties; or

(2) the Office postpones the hearing for good cause shown.

Ms. Simms argues that *Vitek v. Jones*, 445 U.S. 480 (1980), *Jones*, 463 U.S. at 363-66, and *Foucha*, 504 U.S. at 71 are dispositive on the issue of dangerousness. Although these cases provide a relevant consideration for initial commitment, they are not dispositive, as Ms. Simms was committed pursuant to her *Alford* plea.

In *Vitek*, 445 U.S. at 480, the Supreme Court held that there is a protected liberty interest at stake in freedom from involuntary transfer to a mental hospital. The Court recognized that "a valid criminal conviction and prison sentence extinguish a defendant's right to freedom from confinement" and "empower the State to confine him in any of its prisons." *Id.* at 493 (citations omitted). The Court found that due process protections attached to the involuntary transfer because of the "stigmatizing consequences" of a transfer to a mental hospital and the "subjection of the prisoner to mandatory behavior modification" for a mental illness treatment. *Id.* at 494. In *Vitek*, before transferring the prisoner to a mental hospital, the State was required to provide the prisoner with notice, a hearing, the opportunity to be heard, an "independent decisionmaker," a written statement by the factfinder for the evidence relied upon for transferring the inmate, legal counsel if the prisoner could not afford his own, and notice of the prisoner's rights. *Id.* at 494-95. The concern in that case was that a prisoner was being "arbitrarily classified as mentally ill[.]" *Id.* at 495.

25

In *Jones*, 463 U.S. at 354, the defendant, Michael Jones, was hospitalized in a psychiatric facility after being found not guilty by reason of insanity for petty larceny. Jones claimed that he should be released because he had already been confined for a longer time than the maximum sentence for his crime allowed. *Id.* at 356. The Supreme Court held that 1) when a criminal defendant establishes, by a preponderance of the evidence, that he or she is not guilty by reason of insanity, the government may commit the person to a mental institution, and 2) the acquittal by reason of insanity constitutes a sufficient basis for indefinite hospitalization for the purposes of treatment and protection of society. *Id.* at 366-68. It was the finding beyond a reasonable doubt that Jones committed a criminal act itself that demonstrated inherent dangerousness. *Id.* at 364. That inherent dangerousness, coupled with the determination that his action was due to mental illness, made it such that automatic commitment did not violate Jones' due process rights. *Id.* at 363-66.

In *Foucha*, an individual was charged with aggravated burglary and illegal discharge of a firearm. 504 U.S. at 73. The only evidence of mental illness the State proffered was Foucha's behavior at a mental institution, his antisocial personality, and a refusal to certify that he would not be dangerous. *Id.* at 82. The Court held that because Louisiana failed to contend that Foucha was mentally ill at the time of the trial court's hearing, the basis for confining him had ended, and his continued confinement was improper. *Id.* at 78.

In the instant case, the Order of Conditional Release provided that if Ms. Simms violated any terms of the conditional release, the State could admit her to Perkins

26

Hospital for an evaluation to see whether or not she should continue to be on a conditional release. Unlike the facts and circumstances in *Foucha* and *Vitek*, Ms. Simms was found to be mentally ill at all relevant times, beginning when she was adjudicated NCR for her son's death as a result of her *Alford* plea. Like the criminal defendant in *Jones*, there was a finding beyond a reasonable doubt that Ms. Simms committed a criminal act that demonstrated dangerousness. The issue we must first address is the statutory procedural requirements as to the requested hospital warrant once Ms. Simms was released to the community subject to conditions.

We disagree with Ms. Simms that a finding of dangerousness must be made to support a circuit court's determination that probable cause of an individual's violation of an Order of Conditional Release exists. Under CP § 3-114(c), "the determination of whether a patient poses a danger to himself or others takes into account proposed conditions of release when the individual is initially released from commitment." *Hawkes v. State*, 433 Md. 105, 108-09 (2013). Conditional release is part of a continuing course of treatment which allows the patient to be released. *Id.* at 133. The articulated specific conditions were designed to mitigate any risk the patient posed. *Id.* at 134.

Answering Ms. Simms' question involves statutory construction, which the Court of Appeals outlined in *Bell v. Chance*, 460 Md. 28, 53 (2018) (citations and quotations omitted):

> When we construe a statute, we search for legislative intent. Consideration of the statutory text in context is our primary guide. We may refer to the statute's legislative history to confirm conclusions or resolve questions from our examination of the text. Finally, we check our interpretation against the consequences of alternative readings of the text. Throughout

27

this process, we avoid constructions that are illogical or nonsensical, or that render a statute meaningless.

CP § 3-121(e) provides as follows:

(e) *Determination of probable cause. –* If the court's review of the petition *determines that there is probable cause to believe that the committed person has violated a conditional release,* the court promptly shall:

(1) issue a hospital warrant for the committed person and direct that on execution the committed person shall be transported to the facility designated by the Health Department; and

(2) send a copy of the hospital warrant and the petition to:

(i) the State's Attorney;
(ii) the Public Defender;
(iii) the counsel of record for the committed person;
(iv) the person who reported the violation;
(v) the Office; and
(vi) the Health Department.

(Emphasis added).

There is nothing in the above cited section of the applicable statute that even hints at a requirement that there be a finding that Ms. Simms is a danger to herself, property or others at this stage of the proceedings in order to issue a hospital warrant. It is important to note that the point of this debate is whether Ms. Simms would be transported to a facility for a revocation hearing, which is required to be held within ten days. *See* CP § 3-121(e) and CP § 3-121(g).

Ms. Simms argues that her interpretation would dovetail with the express language in CP § 3-121(c), which states that a petition requesting revocation must contain a "statement that the committed person has violated a term of the conditional release and

28

that there is therefore reason to believe that the committed person no longer meets the criteria for eligibility of conditional release."

Ms. Simms' dissection of the requirement for a petition is flawed. The operative language is "there is therefore," which does not add a second requirement of dangerousness, but as used grammatically in this sentence means "for that reason." BLACK'S LAW DICTIONARY 1517 (8th ed. 2004); A Dictionary of Modern Legal Usage 878 (2nd ed. 2001) ("for that reason," "consequently," or ergo). Ms. Simms fails to mount a cogent and persuasive argument otherwise.[9] The procedures in place and followed by the State are practical, logical and protective of the rights of Ms. Simms.

Ms. Simms does not dispute that she failed to follow the terms of her conditional release, most specifically attending her therapy appointments, thereby triggering CP § 3-121(c).[10] All that the circuit court judge was required to find was probable cause that Ms. Simms violated *a term* of her conditional release. Substantial evidence in the record,

---

[9] As noted above, in this case, once before an ALJ for a hearing pursuant to CP § 3-121(f) to determine whether Ms. Simms violated a condition of her release, and if so, whether she was nevertheless eligible for release with conditions, an agreement was reached beneficial to her and the community. The Department and Ms. Simms agreed to modify conditions that allowed her to reside at a residential treatment center upon release from the hospital. The ALJ accepted this agreement and, on September 28, 2017, issued a decision recommending that the Circuit Court for Charles County adopt the modified release conditions. On October 20, 2017, the circuit court issued an order adopting the findings and recommendations of the ALJ and ordered Ms. Simms' conditional release.

[10] As the circuit court noted, Ms. Simms, in her *habeas* petition, "concedes that she has missed five therapy appointments and therefore has violated the terms of her conditional release."

including the testimony of Ms. Mannino and the therapy appointment log, provided the court with probable cause to believe that Ms. Simms violated condition #4 of her release.

### V. Due Process

We now turn to Ms. Simms' concerns related to procedural due process. *Addington*, 441 U.S. at 429, 433, held that to commit an individual to a mental institution in a civil proceeding, the State is required by the Due Process Clause to prove by clear and convincing evidence the two statutory preconditions to commitment: that the person sought to be committed is mentally ill and that he requires hospitalization for his own welfare and protection of others. Proof beyond a reasonable doubt was not required, but proof by preponderance of the evidence fell short of satisfying due process. *Id.* at 432.

When a person charged with having committed a crime is found not guilty by reason of insanity, however, a State may commit that person without satisfying the *Addington* burden with respect to mental illness and dangerousness. *Jones, supra.* Such a verdict, "establish[ed] two facts: (i) the defendant committed an act that constitutes a criminal offense, and (ii) he committed the act because of mental illness," *id.*, 463 U.S. at 363, an illness that the defendant adequately proved in this context by a preponderance of the evidence. From these two facts, it could be properly inferred that at the time of the verdict, the defendant was still mentally ill and dangerous and hence could be committed. *Id.* at 363-64; *see also Foucha*, 504 U.S. at 76.

Ms. Simms argued that, in not requiring a finding of dangerousness at the hospital warrant stage of the revocation hearing or conditional release proceedings, the circuit

court denied her procedural due process. She likens the "process due" to that of parole and probation revocation hearings.

Specifically, Ms. Simms contends the revocation of her conditional release at the hospital warrant stage must comply with the Due Process Clause of the Fourteenth Amendment and its counterpart provision in Article 24 of the Maryland Declaration of Rights.[11] Under what the United States Supreme Court coined "the canon of constitutional avoidance," *Clark v. Martinez*, 543 U.S. 371, 381-82 (2005), a statute is construed to avoid conflict with the Constitution wherever it is possible to do so, even to the extent of applying a judicial gloss to interpretation that skirts a constitutional confrontation. *Koshko v. Haining*, 398 Md. 404, 425-27 (2007) (citing *In re James D.*, 295 Md. 314, 327 (1983)). We do not presume that the Legislature intended to enact unconstitutional legislation and, if it did so intend, we would limit a statute to only those situations in which it would pass constitutional muster. *See Burruss v. Bd. of Cty. Commissioners of Frederick Cty.*, 427 Md. 231, 263-64 (2012) (citing *Koshko*, 398 Md. at 426) (stating that a challenge to the facial validity of a statute must establish that there is no set of circumstances under which the act would be constitutional).

Maryland "proceedings are to be tested by fundamental fairness [-] the touchstone of due process." *State v. Bryan*, 284 Md. 152, 159 n.6 (1978) (citing *Gagnon v.*

---

[11] The Fourteenth Amendment states, in pertinent part: "No State shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend XIV, §1. Article 24 of the Maryland Declaration of Rights provides: "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

31

*Scarpelli*, 411 U.S. 778, 790 (1973)).  The cornerstone of due process is notice and the opportunity to be heard.  *Gagnon*, 411 U.S. at 786.

Ms. Simms avers that CP § 3-114(c) and CP § 3-121 are essentially prophylactic measures safeguarding the constitutionality of mental health commitments, and that the issuance of a hospital warrant without regard to the question of dangerousness fails to pass constitutional muster.  Ms. Simms contends that to abide by the canon of constitutional avoidance, *see Harrison-Solomon*, 442 Md. at 254, 287 (2018), CP § 3-121(e) must be interpreted to require that a hospital warrant may be issued only if there is probable cause to believe that an individual on conditional release violated a term and is no longer eligible for conditional release because he or she poses a danger.  Because the Circuit Court for Charles County did not apply this standard, Ms. Simms argues that the Circuit Court for Howard County erred in denying the Petition for Writ of *Habeas Corpus*.  This is just a recast of Ms. Simms' first argument, because it presupposes that at the hospital warrant stage there must be a finding of dangerousness, and as discussed above, there is no such requirement.

Ms. Simms directs this court to *Bergstein v. State* for guidance.  As to this issue, the *Bergstein* Court examined the difference between a revocation of conditional release and a revocation of parole or probation:

> Although a probation/parole revocation hearing is not identical to a hearing to revoke conditional release, some similarity is apparent.  Both involve an adjudication of whether an individual violated the terms of his or her release and whether this violation should result in reconfinement.  Nonetheless, there are significant differences between a mental health patient on conditional release and a convicted criminal on parole or probation.  Parole and probation are essentially a product of punitive

32

sanctions imposed for the commission of a criminal act. A violation of parole or probation is a willful or knowing violation of a condition of the parole or probation. Conditional release, however, is not a tool of the penal system. Rather, it is a therapeutic release of a mentally ill individual from a psychiatric hospital as part of a continuing course of treatment. The deprivation of liberty involved in the initial hospitalization or in rehospitalization clearly is not imposed as a punishment. The test for the release of a person committed to a mental institution is whether the patient if released would be a danger to the welfare of himself or society as a whole. Violation of a conditional release, even if unintentional, can result in recommitment. A patient may suffer a relapse resulting in a deterioration of his or her mental condition that renders the patient incapable of intentionally violating the conditions of release. If this causes the individual to be a danger to self or others, then the need for immediate recommitment is of paramount importance for both the public's and the patient's safety. On the other hand, if a patient intentionally violates a term of his/her conditional release, but it is clear that the violation does not result in the patient being a danger to self or others, such a violation should not result in rehospitalization, since the purpose of the rehospitalization is therapeutic, not punitive.

*Id.* at 515-17 (cleaned up).[12]

> *The finding that one or more of the terms of conditional release have been violated is a prerequisite to, but does not mandate, revocation of the conditional release. The patient may be able to demonstrate that, notwithstanding the violation, the patient would not be a danger to himself/herself or others if permitted to remain out of the hospital under existing or modified conditions.*

*Bergstein*, 322 Md. at 416-17 (emphasis added).

Ms. Simms argues that *Bergstein* teaches us that the mere fact that an individual violates a term of conditional release, even if done on purpose, does not mean that re-

---

[12] The Court of Appeals recently explained the recent increase in use of "cleaned up" as a parenthetical. The parenthetical "signals that the current author has sought to improve readability by removing extraneous, non-substantive clutter (such as brackets, quotation marks, ellipses, footnote signals, internal citations or made un-bracketed changes to capitalization) without altering the substance of the quotation." *Lopez v. State*, 458 Md. 164, 195 n.13 (2018).

33

hospitalization is in order. Instead, when an individual is alleged to have violated conditional release, the paramount consideration is whether confinement will be in the best interest of the patient's mental health and public at large. The *Bergstein* Court explained that there must be a weighing of the mental health needs of the committed person with the risk to society, if any, posed by the patient's continued release. *Bergstein*, 322 Md. at 519-20.

Ms. Simms argues that the *Bergstein* Court recognized that even if a conditionally released individual has violated a term, the overarching concern for a court must be whether or not, despite the violation, the individual poses a danger to himself/herself, others, or property. As noted earlier, the Supreme Court has repeatedly reaffirmed that a finding of dangerousness must underpin a decision to commit someone involuntarily. *See Foucha*, 504 U.S. at 77; *Jones*, 463 U.S. at 368. Ms. Simms contends that there is no logical reason, then, why it should be permissible for a court considering a hospital warrant petition to disregard completely the question of dangerousness, and instead leave that question to the ALJ. Put another way, where conditional release may be revoked only where there has been a violation *and* where the released individual poses a danger, it does not make sense for a hospital warrant court to consider only the former, but not the latter.

In *Bergstein*, an individual violated his conditional release and was deemed a danger to himself or others. *Id.* at 511-12. A circuit court judge issued a hospital warrant for him, and he was returned to Perkins Hospital. *Id.* at 512. The Court noted that "[t]he finding that one or more of the terms of conditional release have been violated is a

34

prerequisite to, but does not mandate revocation of the conditional release. The patient may be able to demonstrate that, notwithstanding the violation, the patient would not be a danger to himself/herself or others if permitted to remain out of the hospital under existing or modified conditions." *Id.* at 517. The Court held that the individual was not denied due process at the revocation hearing because "[t]he finding that Bergstein was not guilty by reason of insanity presupposes that he committed an illegal act. Inherent in this inference is the indicia of continuing dangerousness." *Id.* at 519.

In directing this Court to *Bergstein*, Ms. Simms argues that the level of process due is similar to that given in parole and probation hearings with the same evidence required at both hearings. That due process also includes a preliminary hearing and a revocation hearing. Even if that is the case, the statute in question does not require the same standards.

The circuit court's issuance of a hospital warrant, without making a finding of dangerousness, did not violate Ms. Simms' due process rights. Ms. Simms conflates the requirement for the issuance of a hospital warrant under CP § 3-121(e) with CP § 3-121(f). As discussed above, CP § 3-121 only requires that the court review the petition and determine that there is probable cause to believe that the committed person has violated a conditional release. Ms. Simms' due process rights were not violated as she received a full hearing as to dangerousness within ten days, pursuant to CP § 3-121(f), where the State had to prove that she violated her conditional release but she nevertheless has proved eligible for conditional release. The hearing, pursuant to this provision, was set to determine whether she should continue to be hospitalized.

35

## CONCLUSION

In the instant case, we hold that the legal standard for a circuit court issuing a hospital warrant pursuant to CP § 3-121(c) continues to be probable cause that an individual violated a term of their conditional release, and a court does not have to make an initial finding of dangerousness. There is no existing case law that would compel us to disturb this standard.

> **JUDGMENTS OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**